UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| XIANSONG LIU, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 24-cv-6422 |
| v. | ) |
| | ) Judge April M. Perry |
| HONGYE LI, and NORTH PACIFIC LLC, | ) |
| a Delaware limited liability company, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**OPINION AND ORDER**

Plaintiff Xiansong Liu, a real estate broker living in Chicago, brings this action against Defendants Hongye Li ("Defendant"), a resident of China, and North Pacific LLC, a Delaware company. Plaintiff alleges that Defendant presented herself to Plaintiff as a skilled equities trader and manager of a profitable investment fund. In March 2024, Plaintiff executed an investment agreement with North Pacific LLC and transferred $370,000 to Defendant's bank account. Three months later, Defendant told Plaintiff that the fund was liquidating and returned just $51,126 of Plaintiff's investment. The gravamen of Plaintiff's complaint is that Defendant defrauded him into making his investment based on false representations about the fund and Defendant's trading prowess. Before this Court is Defendant's motion to dismiss Plaintiff's complaint for lack of personal jurisdiction under Rule 12(b)(2) or, in the alternative, for an evidentiary hearing. Doc. 55. For the following reasons, Defendant's motion is denied.

**LEGAL STANDARD**

When a defendant challenges personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of affirmatively establishing personal jurisdiction. *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). To decide whether jurisdiction exists, a court may reach beyond the complaint's allegations and consider evidence submitted by the parties. *Curry v. Revolution Labs.*, 949 F.3d 385, 393 (7th Cir. 2020). A court may resolve a Rule 12(b)(2) motion based solely on the parties' written materials, and in such cases the plaintiff "need only make out a *prima facie* case of personal jurisdiction." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). In this posture, courts "take as true all well-pleaded facts alleged in the complaint and resolve any factual disputes in the affidavits in favor of the plaintiff." *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). However, if the evidence presents material factual disputes, an evidentiary hearing is then appropriate. *Hyatt*, 302 F.3d at 713. At such a hearing, "the plaintiff must establish jurisdiction by a preponderance of the evidence." *Purdue Rsch.*, 338 F.3d at 782.

**PERSONAL JURSDICTION FACTS**

Plaintiff is a real estate broker who lives and works in Chicago. Doc. 56-1 at 2. Defendant is a Chinese national who has lived in China since April 2021 and last lived in Illinois in June 2020. Doc. 22-1 ¶¶ 2–3.

In 2023, Plaintiff and Defendant met virtually through a mutual acquaintance. Doc. 56-1 at 2. The reason for the introduction was for Plaintiff to help Defendant manage a condominium Defendant owned in Chicago. *Id.* Because Defendant lived in China at the time, the parties primarily communicated through WeChat, a Chinese mobile app with a messaging function. *Id.* at 3.

On January 3, 2024, the parties met in person while Plaintiff was on vacation in China. Doc 56-1 at 4; Doc. 22-1 ¶ 4. At this meeting, Defendant shared with Plaintiff that she had graduated from business school in Chicago and was an equities trader with AMC China, a Chinese asset management firm. Doc. 56-1 at 4. Defendant attests it was at this meeting that Plaintiff first learned of Defendant's participation in an investment group comprised of Defendant and a few of her close friends. Doc. 22-1 ¶¶ 5–6. Defendant further attests that some members of the group invest together as North Pacific LLC in order to access U.S. markets. *Id*.

After Plaintiff's departure from China, the parties continued to communicate through WeChat. The chat records show that throughout January, the parties discussed Defendant connecting Plaintiff with a TikTok/Douyin executive in need of commercial real estate assistance. Doc. 56-1 at 72–81, 83. Defendant proposed she should earn a commission for connecting Plaintiff to the executive and forwarded Plaintiff draft agreements outlining payment terms. *Id*. at 77–79. No agreement was signed or commission paid for this proposed deal. *See id*. at 5.

On February 4, 2024, Plaintiff asked Defendant for advice on whether to purchase a Nvidia call option.[1] *Id*. at 80. Defendant advised Plaintiff against the purchase due to the option's limited appreciation potential. *Id.* Plaintiff then sent a screenshot of a different option to Defendant that he intended to buy instead. *Id*. at 81. Defendant told Plaintiff this option was satisfactory and then shared that she had bought a Nvidia call option the week before and seen the price triple. *Id*. at 81. Plaintiff responded that he was impressed by the threefold gain, to

---

[1] Nvidia is a U.S. technology company. A call option is a financial contract that gives the option-holder the right, but not obligation, to buy a share of stock at a specific price before some future date.

3

which Defendant explained that she had been in the option business for a long time and was aiming for up to tenfold return for the month of February. *Id.* at 81–82. To this, Plaintiff expressed awe, noting, "One month? 10 times? OMG. I'm honestly getting a little tempted just listening to this—I might jump in first thing at market open tomorrow." *Id*. at 82.

  Plaintiff then asked Defendant if he could follow her trades. *Id*. at 83. Defendant responded that she already had "people giving me money to trade" and lacked capacity to take on other investors and could not "squeeze [Plaintiff] in" beyond "a few hundred thousand dollars." *Id*. at 83–84. When Plaintiff told Defendant he was fine participating at that dollar value, Defendant began sharing details of her investment group, including the specific split of profits. *Id*. at 84. Defendant then asked Plaintiff if he found these investment terms acceptable. Plaintiff did not immediately respond. *Id.*

  The next day, on February 5, Defendant messaged Plaintiff that Nvidia's option price had increased by fifty percent. *Id*. Plaintiff asked Defendant whether her other investors were subject to the same profit-sharing structure Defendant had shared the day before. *Id*. at 85. After Defendant confirmed the "same structure for everyone," Plaintiff replied, "[T]hat works for me," and asked to discuss next steps. *Id*. The parties then began discussing a written instrument memorializing the business arrangement, with Defendant explaining that trading could begin within five business days of Plaintiff transferring the funds. *Id*. at 86. Defendant also sent Plaintiff a graph showing she had achieved a return rate of roughly 154% on her trading in just five days. *Id*. at 87. The parties also discussed other details, including whether Defendant had an English version of her typical written instrument and whether she accepted U.S. or Chinese currency, to which Defendant responded that she wanted U.S. dollars only. *Id*. at 87–88. Later that day, Defendant sent Plaintiff the written agreements to review. Again, Plaintiff did not

4

immediately respond, which he explains in his affidavit was because he "wanted to take time to consider investing what is a substantial sum of money for my family and I—$370,000." *Id*. at 6.

On February 8, with no agreement yet signed, Defendant sent Plaintiff another screenshot showing her trading performance and bragged that she "already made 20% profit tonight." *Id*. at 91–92. Defendant then told Plaintiff that the fund would close next week, and "if you are interested … please sign the agreement, otherwise we can do this next time." *Id*. at 92. Plaintiff responded that he would review the agreement but did not commit to signing it. *Id*.

Although the parties continued texting on other topics, they did not discuss Defendant's investment fund again until February 27. That day, Plaintiff asked Defendant for more details on her fund and the two agreed to schedule a time to speak by phone or Zoom to discuss it. *Id*. at 97. On February 29, Defendant sent another screenshot showing a 558% monthly return rate on her fund, alongside the message, "Come to check out something fun." *Id*. at 98.

On March 4, Defendant sent Plaintiff an agreement for Plaintiff to sign, instructions for Plaintiff to wire his $370,00 investment to Defendant's bank account, and another graph showing Defendant's 82.26% trading profits over four days, alongside the message, "[d]oubling it again this month should be about enough." *Id.* at 102. That same day, the parties spoke by phone for over an hour about the details of the agreement. *Id*. at 8. One topic of concern for Plaintiff was why Defendant's aunt, Ying Hua, was executing the agreement rather than Defendant herself. *Id*. Defendant explained that she did not want her Chinese employer knowing she was operating a fund in the United States but assured Plaintiff that Defendant, not her aunt, would make all trading decisions for the fund. *Id*.

Between March 7 and March 9, the parties discussed and exchanged edits to the agreement, with the final agreement executed by both parties on March 10 (the "Agreement").

*See id*. at 104–5; *see also id*. at 68–70 (English version of the Agreement). The Agreement included a clause for Defendant to return Plaintiff's money by May 31, 2024 and an Illinois choice of law provision. *Id*. at 68, 70. On March 14, Plaintiff wired $370,000 from his Illinois bank account to Defendant's bank account, which was linked to an Illinois residential address. *Id*. at 9.

Two months later, on May 18, Defendant messaged Plaintiff that the fund had been largely inactive. *Id*. at 107. When Plaintiff asked whether the fund was losing money, Defendant assured Plaintiff it was not. *Id*. On May 31, Plaintiff messaged Defendant asking about the fund's performance and whether it had matured. *Id*. Defendant replied that she wanted everyone to keep their money in the fund. Defendant then sent a screenshot showing an 886.96% gain in trading and had a phone call with Plaintiff. *Id*. at 9, 108. After the phone call, Plaintiff sent Defendant a new executed agreement agreeing to let Defendant keep his money for another month. *Id*. at 109. A few hours later, Plaintiff sent another message to Defendant, explaining that he had placed trust in Defendant and that while he was "okay with continuing through June," going "beyond that … might not work for me." *Id*. To this, Defendant replied that "[g]ood opportunities are meant to be waited for" and that there were "plenty of doubling opportunities …it just takes patience." *Id*. at 109–10.

On June 11, Defendant messaged that the fund was down 40% and would be liquidated. *Id*. at 111. Over the following days, Plaintiff requested the return of his investment. *Id*. at 10. Around June 24, Defendant told Plaintiff that she had lost around 85% of Plaintiff's $370,000 investment. *Id*. On June 27, Defendant returned the remaining $51,126 to Plaintiff's bank account. On July 25, Plaintiff filed this action in federal court. *See* Doc. 1.

The Court draws the foregoing factual account primarily from the WeChat records. In her affidavit, Defendant summarizes the conversations between the parties by stating that after their January 3 meeting, it was Plaintiff who "persisted to contact [her] throughout January and February 2024, asking to invest his money alongside North Pacific's investment group" and that Defendant "rejected him many times" before finally allowing him to join in March 2024. Doc. 22-1 ¶¶ 7–8. Defendant further adds—and Plaintiff does not dispute—that Plaintiff was the only person in the investment group residing in the United States, that Plaintiff never advertised in the United States or solicited in the United States to seek members for her investment group, and never spoke to anyone in the United States about contributing to the fund other than Plaintiff. *Id*. ¶¶ 10–11. Finally, Defendant notes that Plaintiff also filed a claim against Defendant based on the facts underlying this case with the China Securities Regulatory Commission. *Id*. ¶ 12.

## ANALYSIS

A federal court sitting in diversity "has personal jurisdiction over a nonresident only if a court of the state in which it sits would have such jurisdiction." *Klump v. Duffus*, 71 F.3d 1368, 1371 (7th Cir. 1995). The Illinois long-arm statute permits the exercise of personal jurisdiction to the fullest extent permitted by the Fourteenth Amendment's Due Process Clause. *See Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 590 (7th Cir. 2021). Under the Due Process Clause, a court may not exercise personal jurisdiction over an out-of-state defendant unless the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Personal jurisdiction can be general or specific. *Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012). Plaintiff does not argue that any basis exists for general jurisdiction, and so the Court

focuses on specific jurisdiction. The minimum contacts necessary for the proper exercise of specific jurisdiction arise when a defendant "purposefully directs its activities at the forum state and the alleged injury arises out of those activities." *Mobile Anesthesiologists of Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 444 (7th Cir. 2010). When such contacts are established, and the exercise of jurisdiction "comport[s] with traditional notions of fair play and substantial justice," specific personal jurisdiction may be exercised over the defendant. *See B.D. by and through Myers v. Samsung SDI Co., Ltd.*, 91 F.4th 856, 861 (7th Cir. 2024) (articulating three requirements of specific jurisdiction).

The Court begins by determining whether Defendant purposefully directed her activities at Illinois, or rather whether she is being haled into court here "for merely random, fortuitous, or attenuated contacts with the forum state." *Curry v. Revolution Labs.*, 949 F.3d 385, 398 (7th Cir. 2020) (cleaned up). For the purpose of specific jurisdiction, purposeful availment must be considered in light of the claims a plaintiff brings. *Felland*, 682 F.3d at 674. Here, Plaintiff's claims fall into two broad categories: (1) fraud claims premised on misrepresentations to get Plaintiff to invest money with Defendant; and (2) breach of contract.[2]

As they constitute the majority of Plaintiff's claims, the Court will start by considering the fraud claims. Fraud is an intentional tort, and to establish purposeful direction courts look for:

> (1) intentional conduct (or allegedly intentional and allegedly tortious conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is—plaintiff would be injured—in the forum state.

---

[2] Specifically, the complaint brings claims for unregistered practice as a security broker in violation of 15 U.S.C. § 78 (Count I); securities fraud under 15 U.S.C. § 78j(b) (Count II); securities fraud under the Illinois Securities Law (Count III); violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count IV): common law fraud (Count V); and breach of contract (Count VI). Doc. 42.

*Tamburo v. Dworkin*, 601 F.3d 693, 703 (7th Cir. 2010) (internal citations omitted).

Plaintiff easily has satisfied the first and third requirements. Defendant does not dispute Plaintiff's assertion that she messaged him about her trading performance, and that these representations were intentional acts. Plaintiff alleges that at least some of these statements were actionable misrepresentations, which satisfies the intentional conduct requirement. *Tamburo*, 949 F.3d at 704. Moreover, Defendant does not dispute Plaintiff's assertion that Defendant was aware that Plaintiff lived in Illinois, which supports the inference that Defendant knew any scheme to defraud Plaintiff of over $300,000 would cause injury in Illinois.

That leaves only the question of whether the record demonstrates that that these communications were "expressly aimed" at Illinois. Plaintiff argues they were, while Defendant asserts that because she did not initiate or pursue the business relationship, Plaintiff cannot rely on the messages to establish the express aiming requirement.

Communications by an out-of-state defendant to an in-state plaintiff count towards minimum contacts if those communications "were part of the wrongful conduct that forms the basis of the claim." *Felland*, 682 F.3d at 679. Defendant does not dispute this, but argues that what is decisive is which party—Plaintiff or Defendant—initiated the problematic transaction. For support, Defendant cites *Northern Grain Marketing, LLC v. Greving*, which instructs that "which party initiated or solicited a business transaction has long been considered pertinent to the … personal jurisdiction [question]," 743 F.3d 487, 493 (7th Cir. 2014) (citation omitted). Defendant also cites *Philos Technologies, Inc. v. Philos & D, Inc.*, which held that the mere fact that a defendant "made a contract with an Illinois company … does not outweigh the fact that [the defendant] neither solicited the Illinois company to enter into an agreement nor travelled to

9

the state for the purpose of conducting business with that company." 802 F.3d 905, 915 (7th Cir. 2015).

The Court does not read *Greving* or *Philos Technologies* as broadly as does Defendant. Of course, it is relevant to the purposeful direction analysis which party instigated a transaction. *Madison Consulting Grp. v. State of S.C.*, 752 F.2d 1193, 1202 (7th Cir. 1985). But the Court has not seen any case that holds that it is the only factor. Furthermore, both *Greving* and *Philos Technologies* are distinguishable from the present case because neither involved claims that the defendant attempted to procure the plaintiff's business through fraudulent misrepresentations sent to the forum state. Thus, while the Court will consider who instigated the transaction, it sees no reason to hinge the entire express aiming determination on which party began the communications.

To prove that that it was Plaintiff who instigated the investment contract, Defendant submits an affidavit where she provides her impressions of her conversations with Plaintiff. In approximately four sentences, Defendant explains that she met Plaintiff in person in China in January 2024. Doc. 22-1 ¶ 4. At this meeting, Plaintiff first learned about Defendant's investment group. *Id.* ¶ 5. Defendant then claims that Plaintiff "persisted to contact [Defendant] throughout January and February 2024, asking to invest his money" with her. *Id.* ¶ 7. According to Defendant, she "rejected him many times" before allowing him to invest in March 2024. *Id.* ¶¶ 7-8.

In contrast to Defendant's high-level summary of the conversations between Plaintiff and Defendant, Plaintiff submits the WeChat communications themselves.[3] Based upon the WeChat

---

[3] Defendant does not challenge the authenticity of these exhibits or claim that Plaintiff has failed to translate any relevant communication between the parties.

10

transcript between the parties, they first discussed the possibility of Plaintiff joining Defendant's investment group on February 4, when Plaintiff asked if he could follow Defendant's trades. Doc. 56-1 at 83. This is not inconsistent with Defendant's claim that Plaintiff first suggested investing with Defendant, although Defendant omits from her affidavit any reference to her preceding unprompted boasts of monthly tenfold returns on her investments. Similarly, the chat transcripts are not inconsistent with Defendant's claim that she rejected Plaintiff's request to join her investment group. However, again, the transcripts demonstrate that instead of a flat rejection, Defendant told Plaintiff that she had little capacity to take on new investors, and would have to limit any investment to a few hundred thousand dollars. *See* Doc. 56-1 at 83-84. When Plaintiff confirmed this was possible, Defendant immediately began to describe the profit-sharing terms of her investment group and ask Plaintiff if he found those terms acceptable. *Id*. at 84.

The continuing conversations between the parties show the same pattern of Defendant sending Plaintiff screenshots of her stellar trading performance when there was a lag in communications from Plaintiff, or otherwise exerting subtle pressure on Plaintiff by indicating that the deal was only open for a limited time, a limited amount of money, or to a limited number of people. Based upon this, the Court accepts Defendant's factual representations in her affidavit as true but also finds that the chat records between the parties more completely tell the story and that the story as a whole shows both parties mutually pursuing the first investment contract.

The same cannot be said of the second investment contract, which was the contract that resulted in Plaintiff losing nearly all of his money. The undisputed evidence shows that the first investment contract was set to expire on May 31, and when Plaintiff asked on May 18 if he had lost any money, Defendant told him he had not lost anything, but he had not made much either. *Id*. at 107. When Plaintiff asked again on May 31 if their fund had matured and how it had

performed, Defendant then encouraged Plaintiff to "keep moving forward" and sign a second agreement because "[g]ood opportunities are meant to be waited for" and that there were "plenty of doubling opportunities" to come, after having sent a screenshot showing 886.96% gains in one of Defendant's funds. *Id*. at 108–10. Defendant's affidavit does not so much as mention the second contract, nor does Defendant provide any argument that it was Plaintiff who instigated or pursued this second investment opportunity. Thus, even if instigation and pursuit of a contract were the decisive factors for purposeful direction, it is adequately established here with respect to the contract that ultimately led to Plaintiff's injury.

To be clear: the Court does not find that who begins the business conversation is decisive for the purposes of purposeful direction when the case involves fraudulent misrepresentations. Accepting Plaintiff's allegations and undisputed facts as true, Defendant's repeated misrepresentations to Plaintiff about her massive returns and investing expertise were "part of the wrongful conduct that forms the basis of the claim," and thus can establish that Defendant engaged in conduct expressly aimed at Illinois. *Felland*, 682 F.3d at 679. Similarly, it is well-settled that communications that lull victims who have been defrauded "into a false sense of security" may constitute forum contacts in a personal jurisdiction inquiry, as they may be "considered part of a larger scheme to defraud, even after the money itself was obtained." *Id.* at 675–76. Thus, messages after the first deal was signed where Defendant sent a screenshot showing an 886.96% gain in one of her funds, Doc. 56-1 at 108, and told Plaintiff that he needed to be patient, *id*. at 110, also constitute express aiming for purposes of minimum contacts analysis. Based upon all of this, the Court finds that Defendant purposefully aimed her fraudulent conduct at Illinois.

The Court next turns to Plaintiff's contract claim, which calls for a different minimum contacts inquiry. "[A] contract between a state resident and an out-of-state defendant alone does not automatically establish sufficient minimum contacts." *Citadel Grp. Ltd. v. Wash. Regional Med. Ctr.*, 536 F.3d 757, 761 (7th Cir. 2008). Instead, courts look to the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id*. Various factors may be analyzed, including "who initiated the transaction, where the contract was entered into, where the performance of the contract was to take place, and where the contract was negotiated." *Id*. at 762. Courts focus on these factors because they help courts evaluate whether "defendant purposefully availed [herself] of the privileges of conducting business in the forum state." *Felland*, 682 F.3d at 674.

As was already discussed, the question of who initiated the investment contract is murky as to the first contract, but it is undisputed that Defendant initiated the second contract (which resulted in the loss of investment funds) by reaching out to Plaintiff in Illinois. Plaintiff's performance of the contract consisted entirely of his payment to Defendant, which took place in Illinois via a transfer from Plaintiff's Illinois bank account to Defendant's bank account which also listed an Illinois address. Defendant also agreed that the contract would be governed in part based upon Illinois law. Doc. 56-1 at 70. Given that Defendant negotiated both contracts with someone she knew to be an Illinois resident who she knew signed the contracts in Illinois, agreed to the application of Illinois law, took payment from an Illinois bank account and deposited it into a bank account in her name at an Illinois address, and entirely initiated the second contract,

13

the Court finds that Defendant purposefully directed her activities to Illinois for the purpose of the breach of contract claim.[4]

Not only did Defendant purposefully direct contacts to Illinois, the claims in this case also arise out of those contacts. The 'arising out of' prong of minimum contacts analysis examines whether there is "adequate connection … between the defendant's activities in the forum and the underlying lawsuit." *B.D. by & through Myers v. Samsung Sdi Co.*, 143 F.4th 757, 766 (7th Cir. 2025). Here, Plaintiff's claims plainly arise out of Defendant's alleged communications to Plaintiff in Illinois, as the entire cause of action is based on the communications between the parties surrounding the investment contracts. As in *Felland*, these representations "were not just incidental but are central to the fraudulent course of conduct alleged in the complaint, and are sufficient evidence of both the factual and proximate cause of [Plaintiff's] alleged injury." 682 F.3d at 677. Accordingly, the Court finds the second prong of minimum contacts analysis is satisfied.

Finally, the Court concludes that exercising personal jurisdiction over Defendant does "not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Making this determination requires the court to consider factors including

> the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial

---

[4] Defendant argues repeatedly that it is relevant that she did not sign the investment contracts on behalf of North Pacific LLC. The Court disagrees. It is undisputed that Defendant and her friends pooled their resources as North Pacific LLC to be able to invest in U.S. markets, Doc. 22-1 at ¶ 6, Defendant made the decision to allow Plaintiff to invest with the group and sent him the contract, *id*. ¶¶ 8-9, and Defendant accepted Plaintiff's money into her personal bank account. According to North Pacific's answer to the complaint, North Pacific was formed by Defendant. Doc. 21 ¶ 4. Moreover, Defendant does not provide any evidence to contradict Plaintiff's statement that the only reason Defendant's aunt signed the contract was so Defendant could hide her U.S. investing activity from her employer. Doc. 56-1 at 8.

14

> system's interest in obtaining the most efficient resolution of [the underlying dispute], and the shared interest of the several States in furthering fundamental substantive social policies.

*Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 781 (7th Cir. 2003). Where a plaintiff has satisfactorily established minimum contacts, it is defendant's burden to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985), though to be sure, "the weaker the defendant's contacts with the forum state … the less likely it is that exercising jurisdiction over that defendant is appropriate." *Ill. v. Hemi Grp. LLC*, 622 F.3d 754, 759–60 (7th Cir. 2010).

Defendant raises two fairness arguments. First, she argues that as a Chinese national, extending jurisdiction over her would be highly burdensome, as it would require her to expend excessive time and resources to travel to Illinois to appear and litigate this case. Second, she points out that Plaintiff has also filed a claim against her premised on the same facts with the Chinese Securities Regulatory Commission. This, Defendant argues, would further burden her by forcing her to defend duplicative claims in different jurisdictions.

The Court accords "significant weight" to the "unique burdens placed upon one who must defend oneself in a foreign legal system." *Asahi Metal Indus. Co., Ltd. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102, 114 (1987). Plaintiff contends that Defendant's burden is lessened because she owns property in Chicago and therefore regularly transacts business in Illinois. As Defendant points out, however, property management can happen remotely without Defendant needing to travel regularly from China to the United States. Nothing in Plaintiff's evidence suggests otherwise, and so on balance, the Court finds that the burden factor cuts against the reasonableness of extending personal jurisdiction over Defendant.

Still, burden is not the only fairness factor. The Court also must consider the forum state's interest in adjudicating the dispute. In so doing, the Court finds that there is no question that Illinois has a strong interest in providing a forum for its residents to seek redress for injuries suffered within the state inflicted by out-of-state actors. *See*, *e.g.*, *Curry v. Revolution Labs.*, 949 F.3d 385, 402 (7th Cir. 2020). Similarly, the Plaintiff's interest in obtaining convenient and effective relief is best served by the case being heard in Illinois. While the Court should consider whether China has any interests that would be affected by the exercise of jurisdiction here, it is Defendant's burden to demonstrate how that would be the case and Defendant has not done so. Although it is undisputed that Plaintiff brought proceedings against Defendant before the Chinese Securities Regulatory Commission, Defendant does not argue that China has greater interest in the parties' dispute than Illinois, or that having this dispute heard in Illinois would result in some interference with China's proceeding, or that there is a risk of double-recovery to Plaintiff based upon the China proceeding. In weighing all of the fairness factors, the Court finds that the exercise of personal jurisdiction over Defendant comports with the traditional notions of fair play and substantial justice. Defendant allegedly defrauded a U.S. citizen, via use of a U.S. LLC, taking money from Plaintiff's U.S. bank account and depositing it into Defendant's own U.S. bank account, for the purposes of trading in the secondary market of U.S. stocks. It is more than fair for Defendant to be required to answer these allegations in a U.S. court in the state where Defendant knew her victim resided.

## CONCLUSION

Defendant's motion to dismiss for lack of personal jurisdiction is denied. The Court does not require an evidentiary hearing as Defendant's four-sentence summary of her conversations with Plaintiff does not create a material dispute of fact, especially considering that Defendant's

summary does not address any communication relating to the second investment contract.

Personal jurisdiction over Defendant is proper in Illinois.

Dated: January 23, 2026

                                                                                 APRIL M. PERRY
                                                                                  United States District Judge